In re HECK'S PROPERTIES, INC.,
Debtor in Possession.

Appeal of The OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS OF
HECK'S, INC., Appellant. (Five Cases)

In re HECK'S, INC., Debtor in
Possession. (Three Cases)

In re TAUBERG COMPANY,
Debtor in Possession.

In re HECK'S PROPERTIES II,
INC., Debtor in Possession.

Appeal of BERLACK, ISRAELS
& LIBERMAN, Appellant.

Civ. A. Nos. 2:89–0226 to 2:89–0229,
2:89–0451 and 2:90–0223.

United States District Court,
S.D. West Virginia,
at Charleston.

March 26, 1992.

Robert M. Miller, Berlack, Israels & Liberman, New York City, for Official Committee of Equity Sec. Holders of Heck's, Inc.

Thomas R. Goodwin, Goodwin & Goodwin, Charleston, WV, for Heck's, Properties, Inc.

David Murdoch, Kirkpatrick & Lockhart, Pittsburgh, PA, for Bank Committee.

William F. Dobbs, Jr., Jackson & Kelly, Charleston, WV, for Trade Committee.

Marc E. Richards, Mierson & Kuhn, New York City, for Members of the Bd. of Directors of Heck's, Inc.

John Nesius, Asst. U.S. Trustee, Charleston, WV.

John R. Isaac, Jr., Heck's, Inc., Guy F. Hanna, Heck's, Inc., Nitro, WV, P. Michael Pleska, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, Scott L. Hazan, Otterbourg, Steindler, Housten & Rosen, New York City, Alvin J. Hardee, Jr., Credit Manager, Murray Ohio Mfg., Brentwood, TN, Charles F. O'Hanlon, III, Mellon Bank, N.A., Pittsburgh, PA, Charles I. Jones, Jr., Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Charleston, WV, Joseph M. Scott, Jr., Stoll, Keenon & Park, Lexington, KY, Karl M. Henkels, Credit Manager, Outdoor Sports, Dayton, OH, for various interested parties.

## INDEX

| | | Page |
|---|---|---|
| I. | Background | 743 |
| II. | General Issues | 745 |
| III. | Denial of Fees | 745 |
| | A. Determination of Necessary Services | 746 |
| | B. Section 330(a) Notice and Hearing | 747 |
| | C. Denial of Fees and Expenses Aggregating $214,362.45 | 748 |
| | 1. Fees for Intervention in Breach of Contract Action | 748 |
| | 2. Fees Sought for BI & L's Analysis of Sullivan & Cromwell Documents Relating to Accounting Liability | 750 |
| | 3. Fees Sought for Review and Summaries of Pleadings | 751 |
| | 4. Fees Sought for Review of Net Operating Loss by Tax Partners | 751 |
| | 5. Fees Sought for Fraudulent Conveyance and Preferential Transfer Research | 752 |
| | 6. Fees Sought for Preparation of Statements of Position | 753 |
| | 7. Fees Sought for Analysis of Motion for Setoff | 753 |
| | 8. Fees Sought for Appeal by Laventhol & Horwath | 753 |
| | 9. Motion of BI & L to Reconsider Order of August 11, 1987 | 754 |

| | | Page |
|---|---|---|
| 10. | Increased Rates Sought by Certain BI & L Associates | 754 |
| 11. | Fees Sought for Fee Application Preparation | 754 |
| 12. | Fees Sought for Pre–Disclosure Statement Hearing Litigation | 754 |
| | (a) Application for Appointment of Operating Trustee | 755 |
| | (b) Application to Compel Annual Stockholders Meeting | 757 |
| | (c) State Court Action Against Officers and Directors | 760 |
| IV. | Sanctions | 764 |
| A. | The $91,582.25 Indemnification | 764 |
| 1. | Bankruptcy Rule 9011 | 764 |
| 2. | Heck's Authority to Indemnify | 766 |
| 3. | Due Process re Sanctions | 768 |
| a. | | 768 |
| b. | | 768 |
| 4. | The Propriety of Sanctions | 769 |
| B. | The Withholding of Robert Miller Compensation of $57,596 | 770 |
| V. | Conclusion | 771 |

## MEMORANDUM ORDER

COPENHAVER, District Judge.

The appellant, Berlack, Israels & Liberman (hereinafter, "BI & L"), is now before the court in these consolidated appeals from three orders [1] entered by the United States Bankruptcy Court for the Southern District of West Virginia. The orders appealed from, BI & L contends, improperly denied it fees and expenses incurred during the course of its legal representation of the Equity Security Holders' Committee of Heck's, Inc., in the amount of $210,662.45, and imposed sanctions upon it in the amount of $149,178.25,[2] for a cumulative penalty of $359,840.70. The court notes

that the fees and expenses denied are actually $214,362.45 [3] and, when added to the sanctions of $149,178.25, the aggregate is $363,540.70.

### I. Background

On March 5, 1987, Heck's, Inc., and three of its subsidiaries filed voluntary petitions for bankruptcy relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (hereinafter, "the Code"). After the filing of the voluntary petitions, Heck's and its subsidiaries continued in the possession of their properties and the operation of their businesses as debtors-in-possession (hereinafter, "DIP"

---

**1.** The three orders appealed from include a February 21, 1990, 112 B.R. 775, "Final Fee Order" and corresponding 75–page memorandum opinion authored by United States Bankruptcy Judge Ronald G. Pearson (hereinafter, "Final Fee Order").

For the purposes of this appeal, appellant's objections to that order are consolidated with its appeal of a February 7, 1989, order entitled "Order Overruling Objection of the Equity Security Holders' Committee ..." (hereinafter, "First Indemnification Order"), and a March 29, 1989, order entitled "Order Approving Payment by the Debtor of Certain Legal Fees and Expenses Incurred by its Directors" (hereinafter, "Second Indemnification Order"). In those orders, the bankruptcy court directed Heck's to indemnify its officers and directors for legal expenses incurred in defending litigation filed by BI & L, as counsel for the Equity Security Holders' Committee, against them in Putnam County Circuit Court.

**2.** Of the $149,178.25 sanctions imposed, $91,-582.25 represented the amount which Heck's paid to indemnify its officers and directors for costs incurred in the defense of litigation filed by BI & L on behalf of the Equity Security Holders' Committee against the officers and directors alleging post-petition breach of fiduciary duty. The remaining $57,596.00 represented the amount of fees sought for work performed by BI & L partner, Robert Miller, which the bankruptcy court concluded was "rendered inconsistent with the requirements of Bankruptcy Rule 9011 and Administrative Order III, and which threatened the very possibility of reorganization." See Final Fee Order, 112 B.R. at at 808.

**3.** The $214,362.45 includes $3,800.00 in connection with the ABN litigation, infra pages 749–50, less an inadvertent computation error of $100.00 in the bankruptcy court's Final Fee Order as noted infra at page 754.

or "Heck's") pursuant to Sections 1107 and 1108 of the Code.

During the course of the Heck's bankruptcy case, three committees were appointed to represent creditors: (1) the Unsecured Trade Creditors' Committee which represented Heck's trade creditors (hereinafter, "Trade Committee"), (2) the Bank Committee which represented Heck's bank creditors (hereinafter, "Bank Committee"), and (3) the Equity Security Holders' Committee which represented Heck's common stockholders (hereinafter, "Equity Committee"). Appellant BI & L was, pursuant to order of the bankruptcy court, authorized to represent the Equity Committee as legal counsel during the pendency of the Heck's bankruptcy case. It is observed that the bankruptcy court, despite having approved the employment of BI & L by order of May 1, 1987, subsequently denied the permanent employment of BI & L as counsel for the Equity Committee, concluding that BI & L had acted inconsistently with Administrative Order III in conjunction with, *inter alia,* its billing rates and practices and the quality of services rendered. *See* Bankruptcy Court's Order of October 19, 1987, stayed by order of this court on November 2, 1987. On February 4, 1988, this court reversed the bankruptcy court's denial of the permanent employment of BI & L, finding that the circumstances presented did not warrant depriving the Equity Committee of the privilege of selecting and continuing with its chosen counsel.

The bankruptcy court's final fee order appealed from focuses largely upon actions taken by BI & L on behalf of the Equity Committee during a relatively brief period in the Heck's reorganization case, namely June, 1988, through October, 1988. BI & L contends that, during that period Heck's, as debtor in possession, and its other two official committees, the Bank and Trade Committees, were negotiating intensively in an effort to draft a non-consensual plan of reorganization, while excluding the Equity Committee from the negotiations to the detriment of the Heck's shareholders. During the course of those negotiations, BI & L contends, the debtor proposed a non-consensual plan of reorganization which would have diluted the shareholders' interests to 10% of the company, while granting Heck's senior management 5% of the stock of the reorganized company and other lucrative benefits.

According to BI & L, the Equity Committee was "outraged" by the proposed nonconsensual plan, finding that it unfairly benefited management and the banks. Although negotiations were allegedly attempted between the Equity Committee and the debtor and its management, such negotiations proved to be of no avail, with BI & L asserting that senior management threatened to "cram down their self-serving plan on Heck's shareholders."

In light of the actions and positions taken by the debtor and the two other committees, BI & L contends that the Equity Committee, through BI & L, took immediate steps to protect its constituents' interests prior to a disclosure hearing which was scheduled to occur on October 12, 1988. These steps included "accelerated discovery" of the debtor and Bank and Trade Committees, which discovery, BI & L states, "confirmed that ... projections contained in [Heck's] first Disclosure Statement and Plan of Reorganization were too optimistic." *See* Brief of BI & L, p. 13.

On September 19, 1988, the Equity Committee and three of its individual members/shareholders filed an action against Heck's in the Circuit Court of Putnam County, West Virginia, seeking an order to compel Heck's to hold an annual shareholders' meeting. The individual shareholders also brought a separate complaint in the same state court against senior management and certain of Heck's directors for post-petition breach of fiduciary duty and duty of loyalty and good faith. On October 4, 1988, the Equity Committee moved the bankruptcy court for the appointment of an operating trustee, based upon an analysis of the full magnitude of Heck's losses by the accountants for the Equity Committee, Laventhol & Horwath. BI & L served as counsel in pursuing all of these proceedings.

According to BI & L, the filing of the Putnam County litigation ultimately resulted in "intensive and expedited settlement discussions" which culminated in an agreement being reached on a consensual plan of reorganization. It asserts that, under that agreement, the distribution of common stock to Heck's shareholders increased from 10% to 35%, and that, as part of that agreement, the Equity Committee withdrew, without prejudice, the Putnam County litigation and the motion for appointment of a trustee. BI & L also contends that it voluntarily agreed to reduce a portion of its fees by 20%, from $243,659.60 to $194,927.68, and that each of the parties, including the Bank Committee, agreed in turn to withdraw objections previously posed to BI & L's fee requests.

## II. General Issues

In this appeal, BI & L contends that the bankruptcy court committed reversible error in denying substantial portions of the legal fees sought for work which BI & L performed on behalf of the Equity Committee, arguing that the bankruptcy court denied it due process in connection with its final fee application, failed to apply the proper legal standards in resolving the propriety of its fees, and based the subject fee denials upon faulty legal conclusions and findings of fact. BI & L further argues that the bankruptcy court's imposition of sanctions under Rule 9011 of the Code constitutes reversible error, contending that the bankruptcy court had no jurisdiction to subtract from its fees the amount which Heck's paid to indemnify its officers and directors and, further, that the officers and directors of Heck's had no right to indemnification in the first instance. Moreover, BI & L contends that the bankruptcy court could not properly sanction it pursuant to Code section 9011 for conduct and advice rendered to and on behalf of the Equity Committee in state court, and that the sanctions were improperly imposed by the bankruptcy judge without notice or a hearing, thereby depriving BI & L of due process.

In response to the arguments posed by BI & L, responsive briefs in opposition have been filed by the United States Trustee, and by the official Bank Creditors' Committee. Both contend, inter alia, that the bankruptcy judge's specific denials of fees sought by BI & L were properly predicated upon factual findings that such services were either duplicative, unnecessary, or unreasonable. Likewise, both assert that BI & L was not denied due process by the bankruptcy court's denial of fees, nor by the imposition of fee shifting and fee forfeiture sanctions against BI & L.

In resolving the issues presented in this appeal, the court will first consider the propriety of the bankruptcy court's denial of legal fees and expenses sought by BI & L, and, secondly, whether the bankruptcy judge's imposition of sanctions against BI & L was in error.

## III. Denial of Fees

Compensation for legal services rendered in bankruptcy cases is governed by section 330 of the Bankruptcy Code which provides that a bankruptcy judge may award:

[R]easonable compensation for actual, necessary services rendered by such ... professional person, or attorney as the case may be, and by any paraprofessional persons employed by such ... attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and ... reimbursement for actual, necessary expenses.

See 11 U.S.C. § 330(a). The professional requesting an award of fees for legal services rendered bears the burden of establishing that his services were actual, necessary and reasonable as required by section 330. See In re Pettibone Corp., 74 B.R. 293 (Bkrtcy.N.D.Ill.1987); In re Wildman, 72 B.R. 700 (Bkrtcy.N.D.Ill.1987). Actual services are those services which were actually rendered,[4] while necessary services are those rendered by a professional in

---

**4.** That the services for fees sought by BI & L here were "actual" is not an issue in these appeals.

furtherance of an official committee's duties under section 1103 of the Code and in line with its constituents' interests in the case. *See In re Pettibone*, 74 B.R. 293; *In re Emons Industries, Inc.*, 76 B.R. 59 (Bkrtcy.S.D.N.Y.1987). If professional services are found to have been actual and necessary, the "reasonableness" of the fees sought may be evaluated in accordance with the standards set forth in *Harman v. Levin*, 772 F.2d 1150 (4th Cir.1985), and *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir.1978), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978).

A. Determination of Necessary Services

Although both BI & L and the Bank Committee agree that, pursuant to section 330, professional services must be shown to have been actual, reasonable, and necessary, the parties differ as to how the "necessity" of such services is to be ascertained. According to BI & L, whether a service was "necessary" turns fundamentally upon whether such services were rendered in furtherance of the committee's statutory rights and duties under section 1103.

Pursuant to section 1103, an official committee may:

> (1) consult with the trustee or debtor in possession regarding the administration of the case;
>
> (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of the plan;
>
> (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;
>
> (4) request the appointment of a trustee or examiner under section 1104; and
>
> (5) perform such other services as are in the interest of those represented.

*See* Bankruptcy Code § 1103(c).

According to BI & L, the authority granted by section 1103 is quite broad, and

"[i]f a committee determines to pursue any activity within the vast expanse of section 1103, and if the committee asks counsel for assistance, then counsel's services are 'necessary' and compensable." *See* BI & L's Brief, at p. 28. It argues that, although the bankruptcy court's final fee order in this case recognized the applicability of the necessary standard, the court "glossed over the fact that the Equity Committee directed BI & L to perform the services at issue." BI & L also argues that the bankruptcy court never inquired into the reasonableness of the services rendered but instead "denied fees with a broad brush."

Both the Bank Committee and United States Trustee argue, on the other hand, that it is the bankruptcy judge who, pursuant to section 330, has the discretion to determine the necessity of services rendered by BI & L and other professionals employed in the case, based upon his own hindsight, experience, observations and expertise, inasmuch as the payment of the fees sought ultimately come from the debtor's estate.

■ It is well-settled that legal services which are "necessary" under section 330 are those which are rendered to an official committee in connection with the committee's duties under section 1103. *In re Pettibone*, 74 B.R. 293, at 308. It is equally well-settled that the bankruptcy court retains ultimate responsibility for ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330 of the Code, *see generally* 2 *Collier on Bankruptcy*, ¶ 328.02 at 328–8 (15th ed. 1986). Likewise, it is the court which must ultimately determine whether compensation sought is for actual, necessary and reasonable services. *See, e.g., In re Temple Retirement Community, Inc.*, 97 B.R. 333, 336 (Bkrtcy. W.D.Tex.1989); *In re Pettibone*, 74 B.R. 293 (Bkrtcy.N.D.Ill.1987).

The court in *In re Pettibone* rejected an argument identical to that posed by BI & L in this case that work is "necessary" merely because it was done at the behest of the committee client. *Id.* Finding that Sec-

tions 327 through 331 of the Code "explicitly provide for the court's active role throughout the employment and compensation process," the *Pettibone* court held:

> [T]he very fact that court review of fee applications is required by Section 330 indicates that it is the court that must determine necessity. If necessity were defined by the committee client, the requirements of Section 330 would be meaningless. Review by the court would then entail mere reading of an affidavit by the client that all work was done at its request. Such a result would defeat the purpose of court review under Section 330. The statutory scheme thus demonstrates that the Court must review after the fact all services for which compensation to professionals is sought. It is the court, not the client, that ultimately determines the necessity of particular work based upon hindsight and the court's experience, observations and expertise.

74 B.R. at 308, citing *In re Liberal Market, Inc.*, 24 B.R. 653 (Bkrtcy.S.D.Ohio 1982).

The court concludes that the question of whether services rendered by BI & L were "necessary" is one which was properly considered and passed upon by the bankruptcy judge in light of his experience, observations and expertise. To accept the argument posed by BI & L that necessity is determined by the directives of the committee for which the professional services were performed rather than by the bankruptcy court would be inconsistent with the statutory scheme set forth in the Code regarding the bankruptcy court's role in the employment and compensation process, and would defeat the fundamental purposes underlying section 330.

**B. Section 330(a) Notice and Hearing**

BI & L contends that the bankruptcy court deprived it of due process in connection with its final fee application inasmuch as the court failed to hold a hearing before "slashing" BI & L's fees in the court's final fee order. BI & L insists that due process requires that such a hearing be held concerning fee applications submitted by professionals in a bankruptcy case, cit-

ing Code section 330(a)(1); *American Benefit Life Ins. Co. v. Baddock*, 544 F.2d 1291, 1300 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *In the Matter of Union Cartage Co.*, 56 B.R. 174, 178 Bkrtcy.N.D.Ohio 1986). BI & L further notes that the bankruptcy judge recognized the due process requirements relative to fee awards in cases such as this and stated in an order dated August 17, 1989, that:

> The Court is currently in the process of setting final rates of compensation for all professionals who have performed services in these cases and intends to provide notice of such rates and opportunity for response prior to any final order on compensation of professionals.... [I]t being the Court's intention to provide notice and opportunity for comment or hearing as outlined above, ...

*See* Bankruptcy Docket No. 3462.

The Bank Committee and Trustee argue, on the other hand, that the bankruptcy court gave BI & L all the process it was due in connection with its denial of fees, noting that, in an order dated September 22, 1989, the bankruptcy judge took under consideration the allowance of final fees of attorneys and other professionals working in the Heck's case, along with objections which had been posed to those requests. In the September 22nd order, the court directed that objections to professional fees previously requested should be filed in writing on or before 5:00 p.m. on October 6, 1989. *See* Bankruptcy Docket No. 3560.

The Bank Committee accordingly filed its objections to BI & L's fee requests, alleging, *inter alia*, unnecessary and improper work performed by BI & L, and a memorandum of law in support of its objections. In a subsequent order dated October 30, 1989, the bankruptcy judge took the fee objections under advisement and directed BI & L to respond to the fee objections on or before November 19, 1989.

BI & L did, in fact, file its response to the objections posed by the Bank Committee to BI & L's fee requests. It did not, however, request that a hearing be held on the objections which had been raised, its

responses thereto, or on its final fee application which was filed contemporaneously with its response to the Bank Committee's objections. Thereafter, on February 21, 1990, the bankruptcy judge entered his final fee order and memorandum opinion which denied the legal fees and expenses which are central to this appeal.

Section 330(a) of the Code expressly provides that "after notice to any parties in interest and to the United States Trustee and a hearing ... the court may award to ... a professional person employed ... reasonable compensation for actual, necessary services." It is observed that "after notice and a hearing" as referenced in section 330(a) is specifically defined in section 102 of the Code as follows:

(1) "after notice and a hearing", or a similar phrase—

(A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but

(B) authorizes an act without an actual hearing if such notice is given properly and if—

(i) such a hearing is not requested timely by a party in interest; or

(ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act.

11 U.S.C. § 102(1). Section 330(a) defines the phrase "after notice and a hearing" merely to mean after such notice as is appropriate in the particular circumstances and does not mean that there will be a hearing in the absence of a request therefor. 2 *Collier on Bankruptcy* ¶ 330.03 at 330–13 (15th ed. 1991).

The bankruptcy court having specifically advised counsel by its September 22, 1989, order that it was taking into consideration the allowance of final fees, and having further informed counsel that it was taking under advisement objections which had been filed to the fee applications and having directed that responses to those objections could be filed on or before November 19, 1989, BI & L was given reasonable and adequate notice under the circumstances. That a hearing was not thereafter provided to BI & L in conjunction with its final fee application did not deprive BI & L of due process inasmuch as it did not request such a hearing and inasmuch as it was given the opportunity to respond, and in fact did respond, to the objections which had been posed to its fee requests prior to the court's entry of the final fee order.

## C. Denial of Fees and Expenses Aggregating $214,362.45

It is well-established that the bankruptcy court's findings of fact will not be disturbed unless clearly erroneous. *See* Bankruptcy Rule 8013. Under the "clearly erroneous" standard of review, "findings of fact will be affirmed unless [the appellate court's] review of the entire record leaves [it] with the definite and firm conviction that a mistake has been committed." *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir.1985). The bankruptcy court's conclusions of law will, of course, be reviewed *de novo.*

### 1. *Fees for Intervention in Breach of Contract Action*

■ BI & L complains that the bankruptcy court improperly denied it legal fees related to its efforts to intervene in an action filed in the United States District Court for the Southern District of West Virginia by the debtor-in-possession against Algemene Bank, Nederland, N.V. (hereinafter, "ABN litigation"). In its motion filed August 7, 1987, the Equity Committee asserted an unconditional right to intervene in the ABN litigation under Rule 24(a)(1) of the Federal Rules of Civil Procedure and, alternatively, sought to intervene permissively pursuant to Rule 24(b)(2).

The bankruptcy court's final fee order noted that the Equity Committee's intervention into the ABN litigation was attempted "without leave of the bankruptcy court to permit expansion of counsel's appointment in the bankruptcy case, without notice to creditors of the proposed intervention, and without the capacity as a committee appointed under 11 U.S.C. § 1102 to

assert a cause of action belonging to a debtor-in-possession who was already represented by counsel." The court stated:

> The DIP was asked to pay for numerous hours of time Equity Committee counsel spent in misguided and unnecessary intervention effort. In August and September, 1987, BIL billed $10,383.00; in October, 1987, $2,300.00; and in November, 1987, $1,500.00 for services relating to the ABN litigation. This Court denied each of the above fee requests because the DIP's interests were represented by counsel for the DIP and the work of the Equity Committee was duplicative of that of counsel for the DIP. Although the Equity Committee appealed the denial of the $10,383.00, no appeal was filed of the later denial of fees related to this issue.

*See* Final Fee Order, 112 B.R. at p. 789.[5]

In denying BI & L fees for services rendered incident to the intervention efforts, the court concluded that there was no basis for intervention of right under Rule 24(a) inasmuch as sections 1103 and 1109 of the Bankruptcy Code do not statutorily provide for a right on the part of the Equity Committee to intervene in such an action, nor does any other provision of law provide such a right. The bankruptcy judge also reasoned that "[t]he pursuit of the corporation's interests by the DIP precluded intervention as a matter of right under Rule 24(a)(2) because the stockholders' interests being adequately represented." [6]

As the bankruptcy court observed, section 1109 of the Bankruptcy Code provides that "a party in interest, including ... an equity security holder ... may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109. Noting that the courts are split on the issue of whether section 1109 confers standing upon a committee to initiate an adversary proceeding under Rule 7001, the bankruptcy court observed that where standing has been deemed conferred, "it is generally conditioned on the committee's bringing the suit on behalf of the debtor when the debtor is not adequately pursuing the cause of action," *citing Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233 (5th Cir.1988); *In re STN Enterprises*, 779 F.2d 901 (2d Cir.1985), *on remand*, 73 B.R. 470 (Bkrtcy.D.Vt.1987), *reversed on other grounds*, 99 B.R. 218 (D.Vt.1989). Because the bankruptcy court found that the debtor-in-possession was pursuing the ABN litigation and was adequately representing Heck's shareholders' interests, it concluded that, as pertains to services rendered by BI & L seeking intervention as of right, the fees sought should be denied.

Similarly, the bankruptcy court concluded that BI & L's efforts to permissively intervene in the ABN action were improper and not compensable out of the bankruptcy estate. In that regard, the court reasoned that Rule 24(b) renders permissive intervention appropriate only if "an applicant's claim or defense and the main action have a question of law or fact in common." The court noted that the complaint filed by the Equity Committee with its motion to intervene "states no claim at all!", *see* Final Fee Order, 112 B.R. at p. 790, and concluded, "[b]ecause the injury complained of was to the corporation, the cause of action, if one existed, was the DIP's to pursue for benefit of creditors and shareholders."

The bankruptcy court further noted that BI & L, on behalf of the Equity Committee,

---

**5.** By order of this court dated June 8, 1988, the amount of $10,383.00 was remanded to the bankruptcy court for reconsideration pending ruling by this court on the motion to intervene. Ultimately, the motion to intervene was rendered moot by virtue of this court's order of October 4, 1989, dismissing the ABN litigation pursuant to agreement of the parties.

**6.** Intervention of right under Rule 24(a) is proper when

> (1) ... a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Rule 24(a), Fed.R.Civ.P.

could properly have monitored the work performed by counsel for the DIP to ensure that proper actions were being taken by the DIP in furtherance of the litigation. Inasmuch as $3,000.00 of requested fees had already been allowed BI & L which was commensurate with the amounts paid to other firms which had billed for monitoring the DIP effort, the court denied compensation to BI & L for the remaining $10,383.00 which had been remanded for reconsideration by this court, and affirmed its previous denials in the amount of $3,800.00 which had not been appealed by BI & L.

In these consolidated appeals, BI & L asserts, without citation, that "abundant authority" exists to support the Equity Committee's request to intervene in the ABN litigation. Arguing that its work was "undeniably performed at the direction of the Equity Committee, which acted in furtherance of a legitimate duty and purpose," BI & L urges this court to find its fee requests relative to work performed on the intervention efforts to be compensable and to reverse the bankruptcy court's conclusion to the contrary.

The bankruptcy court's findings of fact relative to the compensability of fees sought in conjunction with the intervention efforts—namely that such efforts were unnecessary—was not clearly erroneous. The denial of compensation is affirmed.

2. *Fees Sought for BI & L's Analysis of Sullivan & Cromwell Documents Relating to Accounting Liability*

■ BI & L argues that the bankruptcy court's denial of fees relative to the time spent by its attorneys reviewing documents produced by Sullivan & Cromwell and Peat Marwick Main & Co. in connection with an alleged accounting failure constitutes reversible error. Arguing that the bankruptcy court authorized the Equity Committee's request to take discovery relating to accounting system failures, BI & L asserts: "[h]aving received court approval, BI & L reviewed notes and related documents from hundreds of interviews conducted for

Heck's by Sullivan & Cromwell." *See* BI & L Brief, at p. 39.

In considering the compensability of the $12,012.50 sought by BI & L for this work, the bankruptcy judge observed that one BI & L lawyer spent 8.9 hours while another spent 68.6 hours reviewing the subject documents, and that 26.3 hours generating $4,076.50 in billable dollars were specifically spent in preparation of a memorandum which "no one outside of BI & L ever saw ...." The court concluded that "neither the fee application of BIL nor its response to the Bank Committee's objection demonstrates the necessity of this work."

Although acknowledging that it had previously permitted BI & L to inspect the Sullivan & Cromwell documents, *see* Bankruptcy Docket Nos. 931–933, the bankruptcy court found that the amount of time spent on review by BI & L was "out of line with reason." *See* Final Fee Order, 112 B.R. at p. 791. The court allowed 15 hours of compensable time, or $2,250.00, and denied the remainder of fees charged in connection with the activity in the amount of $9,762.50 as unnecessary.

■ The burden of proof in all fee matters is upon the applicant, *see, e.g., In re Lindberg Products, Inc.,* 50 B.R. 220, 221 (Bkrtcy.N.D.Ill.1985); *In re Harman Supermarkets,* 44 B.R. 918, 920 (Bkrtcy. W.D.Va.1984), and this burden is not to be taken lightly, "especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by the debtor." *See In re Pettibone,* 74 B.R. at 299, citing *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bkrtcy.E.D.Pa.1981). Moreover, it has been recognized that attorneys are not to be fully compensated for spending an unreasonable number of hours on activities of little benefit to the estate, *see In re Wildman,* 72 B.R. 700, 713 (Bkrtcy. N.D.Ill. 1987), and that the bankruptcy court must determine what is the reasonable amount of time an attorney should have to spend on any given project. *In re Shades of Beauty,* 56 B.R. 946, 951 (Bkrtcy.E.D.N.Y. 1986).

The bankruptcy court's determination that the number of hours spent by BI & L with respect to the Sullivan & Cromwell documents in excess of fifteen hours was unnecessary was not clearly erroneous. The denial of such fees in the amount of $9,762.50 is affirmed.

### 3. Fees Sought for Review and Summaries of Pleadings

■ The bankruptcy judge stated in his final fee order that "associates at BIL read and prepared daily summaries of virtually every document filed in this case." The court concluded that such activity was "beyond the scope of diligence," and that BI & L attorneys should have exercised greater discretion over the extent to which the summarization of pleadings was utilized. The bankruptcy judge, noting that the fee applications of BI & L as well as its response to the objections of the Bank Committee failed to show that all of the summaries prepared by BI & L associates were necessary, denied $20,000.00 of the $30,696.00 requested for reviewing and summarizing pleadings, with the denied amount representative of the time which the court found was "unnecessary work."

BI & L states that it assigned one associate to review "all documents and pleadings received by the firm and to write brief descriptions and analyses" for circulation to the Equity Committee and to the other BI & L attorneys working on the case. While BI & L points out that the bankruptcy court's finding that summaries were prepared "daily" was erroneous, it acknowledges that the summaries were prepared a few times each month.

In *In re Pettibone,* the court concluded that "fees are not allowable for simply reading the work product of another lawyer as a matter of interest," and that "[o]nly if such review is required to form some kind of response or to perform a particular task in the case will document

review be compensable." 74 B.R. at 303. Here, the bankruptcy judge acknowledged that at least a portion of the time spent by BI & L associates was necessary and thus compensable. He determined, however, that less than one-half of the time charged for document review and summarization was necessary service. *See In re Pettibone,* 74 B.R. at 308. This court is unable to conclude that the bankruptcy court's finding in this regard was clearly erroneous.

### 4. Fees Sought for Review of Net Operating Loss by Tax Partners

■ The bankruptcy court denied a portion of fees sought by BI & L in conjunction with the review of net operating loss material by one of BI & L's partners, Harvey Berenson.[7] The court reasoned that one of BI & L's associates, Steven Whitmore, also conducted a review of the same material and attended meetings with the DIP and other counsel to obtain changes in the Plan, and that, in its fee applications and response to objections by the Bank Committee, BI & L had failed to show why Berenson's work was necessary.[8] The court denied $4,140.00 in charges by Mr. Berenson as duplicative and unnecessary.

■ A debtor's estate should not bear the burden of duplication of services, and such duplication should be avoided by counsel on their own initiative by exercise of good "billing judgment." *See Pettibone,* 74 B.R. at 303. "If found in the record, duplication shall be disallowed by the court as unnecessary." *Id.,* citing *In the Matter of Liberal Market,* 24 B.R. 653, 664 (Bkrtcy.S.D.Ohio 1982).

BI & L observes that "the Equity Committee wisely instructed BI & L to keep abreast of certain tax issues critical to the plan formulation process," and that, consequently, BI & L used a tax partner "with extensive bankruptcy tax experience." Ac-

---

7. This review was conducted during November and December, 1988, and January, 1989.

8. BI & L's fee applications reflect that, on November 27, 1988, attorney Whitmore researched the net operating loss materials. *See* Fee Appli-

cation at 2890. Attorney Berenson's review followed. Other BI & L attorneys also logged time for reviewing apparently the same materials and issues. *See* Fee Applications at 2272 and 2603.

cording to BI & L, the work was, by definition, necessary.

The court concludes that, although BI & L could reasonably have utilized the services of one attorney with "extensive bankruptcy experience," it has failed to sufficiently explain in its fee applications, in its response to the Bank Committee's objections, or in its brief in support of this appeal why the apparent duplication of services with regard to net operating losses was necessary. The burden of proof was upon BI & L to establish its entitlement to the fees in question and, having reviewed its fee applications for the months in question, the court is unable to conclude that the bankruptcy court's denial of Berenson's fees on the net operating loss issue as duplicative was clearly erroneous. The denial of fees of $4,140.00 is affirmed.

5. *Fees Sought for Fraudulent Conveyance and Preferential Transfer Research*

■■■ The bankruptcy court denied a major portion of the fees sought by BI & L in conjunction with research performed by BI & L attorneys in April and May, 1988, on the issues of preferential transfer and fraudulent conveyances. In doing so, the court correctly observed that standing may be conferred upon a committee pursuant to § 1109(b) of the Bankruptcy Code to initiate or intervene in an adversary proceeding where the debtor has failed to bring an action or is inadequately representing the estate. It noted, however, that there is no implied right to do so where there is no evidence that the debtor has improperly failed to bring an action or is abusing its discretion in representing the estate.

The bankruptcy judge concluded that it was the duty of counsel for the debtor-in-possession to have conducted the preferential transfer/fraudulent conveyance research, and that in the Heck's case, the debtor apparently did, in fact, do so inasmuch as a plan filed in August, 1988, "compromised a preference claim against the Bank Committee." *See* Final Fee Order, 112 B.R. at 792, apparently referring to a claim against certain members of the Bank Committee. Concluding that a portion of the fees sought by BI & L for work performed by Arlene Koval, one of several BI & L attorneys who researched "appears to have been duplicative," and that BI & L had failed to explain in its response to the Bank Committee's fee objection how such work was not duplicative, the court denied $1,339.00 of the $5,125.00 of fees sought by BI & L for that work.

A review of the bankruptcy records reflects that, prior to Ms. Koval's recorded 10.3 hours of research on fraudulent conveyances, two other BI & L associates and one legal assistant had logged time reviewing cases and issues regarding preferential transfers and fraudulent conveyances, and had conferred with partner Robert Miller and one another at various times regarding the same. *See* Bankruptcy Docket Nos. 1989, 2071, 3596. BI & L argues, in opposition to the objections raised by the Bank Committee, that its time entries "have been deliberately misconstrued ... to suggest duplication." The research efforts by its attorneys was not duplicative, BI & L argues, because each of the attorneys was researching separate and distinct issues. Bankruptcy Docket No. 3693.

Having independently reviewed the subject fee statement entries regarding the preferential transfer and fraudulent conveyance research in question, the court observes that certain of the time entries do, as BI & L argues, indicate that different subissues pertaining to preferential transfer and fraudulent conveyance were researched by the several attorneys logging time for such work. Not all entries are so explicit, however, and it was not clearly erroneous for the bankruptcy judge to have denied as duplicative a portion of the fees sought for closely related research by three separate attorneys.

As noted previously, the burden of proof to show entitlement to fees is, in all fee matters, on the applicant. *See, e.g., In re Metro Transportation Co.,* 107 B.R. 50, 51 (E.D.Pa.1989); *In re Pettibone,* 74 B.R. at 299. The court concludes that the bankruptcy court's denial of $1,339.00 of the

$5,125.00 sought for such work was not clearly erroneous.

### 6. *Fees Sought for Preparation of Statements of Position*

■ The bankruptcy court also denied compensation requests by BI & L for preparation of written statements of position which the court concluded "did not significantly affect the interests of equity security holders." Final Fee Order, 112 B.R. at 792. Specifically, $4,379.89 in fees was denied for those months in which the court found that "BIL also attended hearings and verbally announced the position of the Equity Committee," rendering the written position statements to have been duplicative and unnecessary work.

BI & L asserts that, at an earlier chambers conference, the bankruptcy judge "complimented BI & L on these position statements and urged other committees to use this format." It contends that, in addition to its efforts on behalf of the Equity Committee, the Trade Committee also prepared written position statements throughout the remainder of the case and that, to its knowledge, "the lower court did not penalize the Trade Committee's counsel for the same conduct." [9]

■ Fees should be closely scrutinized with a view toward eliminating excessive or wasteful services and expenditures of professional time. *See In the Matter of Liberal Market, Inc.*, 24 B.R. 653, 658 (Bkrtcy. S.D.Ohio 1982). Having previously observed that unnecessary duplication of services should be avoided by counsel, it follows that if the court finds a duplication of effort on the part of professionals seeking compensation from the bankruptcy estate, fees sought in conjunction therewith should be disallowed by the court as unnecessary. *See In re Pettibone*, 74 B.R. at 303, citing *In the Matter of Liberal Market, Inc.*, 24 B.R. 653, 664 (Bkrtcy.S.D.Ohio 1982).

Finding that BI & L's fee statements, response to the Bank Committee's objections, and brief on appeal fail to adequately explain why both the written and oral presentation of position were not duplicative, the court concludes that the bankruptcy court's denial of $4,379.89 in fees sought for the preparation of written position statements was not clearly erroneous.

### 7. *Fees Sought for Analysis of Motion for Setoff*

The bankruptcy court denied $6,400.00 of the $8,000.00 in fees charged by BI & L for the Equity Committee's brief opposing the motion for setoff by Pittsburgh National Bank. The two and one-half page brief so filed was found by the court to have been filed late and to be "much less comprehensive than one filed by counsel for the Trade Committee, who charged much less for their work," the court further finding the BI & L brief to have been duplicative and unnecessary. This court, in its order of February 4, 1988, observed that substantial basis existed for somewhat similar findings by the bankruptcy court with respect to this same matter. The denial of fees to the extent of $6,400.00 is not clearly erroneous.

### 8. *Fees Sought for Appeal by Laventhol & Horwath*

■ The bankruptcy court denied fees of $1,542.24 and expenses of $614.25 for court reporter and filing fees with respect to BI & L's participation in the joint appeal of the Equity Committee and its accountants, Laventhol & Horwath, of the bankruptcy court's order pertaining to Laventhol & Horwath's accounting fees. The bankruptcy court did so on each of two grounds, the first being that BI & L's representation was outside the scope of its authorized employment as counsel for the Equity Committee and the second being that BI & L's services were unnecessary to the representation of the Equity Committee. To the contrary, it appears that the Equity Committee did engage BI & L for the purpose of representing the Equity Committee with respect to its joint appeal with its accounting firm, which appeared

---

**9.** BI & L does not, however, provide this court with any record references by which it can be verified whether, and to what extent, the Trade Committee's counsel sought compensation for such services.

separately by its own in-house counsel. BI & L Brief at 44–45. It further appears that the modest fees and expenses involved were necessary in order for the Equity Committee to protect its continuing professional relationship with its accountants, Laventhol & Horwath. In view of these circumstances, the denial of compensation and reimbursement in the total amount of $2,156.49 was clearly erroneous.

### 9. *Motion of BI & L to Reconsider Order of August 11, 1987*

Upon reconsideration of fees in the amount of $27,780.00 earlier denied by the bankruptcy court's order of August 11, 1987, the court allowed $8,168.00, but persisted in its denial of the balance of $19,-612.00.[10] In addition, the bankruptcy court adhered to its denial of $1,500.00 in expenses. The court's reasons for its continuing denial are aptly set forth in its order of February 21, 1990, 112 B.R. at pages 805–806. The denial of such fees and expenses in the total amount of $21,-112.00 was not clearly erroneous.

### 10. *Increased Rates Sought by Certain BI & L Associates*

■ The bankruptcy court denied a portion of the rates of compensation for two BI & L associates for services rendered during the last half of the bankruptcy case. This portion consisted of the increases in hourly rates by $20.00 for one associate and $30.00 for the other, aggregating $4,606.80. The bankruptcy court found "[n]o justification ... for increasing the rate ... especially in light of the meritless motions pursued at the direction of lead counsel." The bankruptcy court neither specified the motions to which it referred nor did it assign any other reason for its denial. Inasmuch as the bankruptcy case progressed over a period of two and one-half years and the billing rates for those two associates would be expected to increase during that period, no adequate rea-

son for the denial has been assigned. The court concludes that the denial of these fees in the total amount of $4,606.80 was clearly erroneous.

### 11. *Fees Sought for Fee Application Preparation*

■ BI & L requested $36,758.80 for time spent in preparation of fee applications. For this purpose, the bankruptcy court limited each professional employed in the case to 3% of the total fees allowed to such professional. Based on total net compensation allowed BI & L of $336,447.67, the bankruptcy court allowed 3% or $10,-093.43, and denied the remaining $26,-665.37. The limitation of all professionals to the 3% standard in a case with fees of the magnitude of those presented here is deemed reasonable.[11] *See In re Pettibone*, 74 B.R. 293, 304 (Bkrtcy.N.D.Ill.1987); *In re Wildman*, 72 B.R. 700, 710–11 (Bkrtcy. N.D.Ill.1987).

Inasmuch as the net compensation to which BI & L is entitled by virtue of the other rulings on this appeal has increased by $143,208.69, the allowable fees for this purpose are correspondingly increased by 3% of that sum, being $4,296.26. Additionally, the $91,528.25 in indemnification sanctions elsewhere dealt with on this appeal should not be used, as did the bankruptcy court, to lower the figure on which the 3% is calculated. Accordingly, 3% of $91,-582.25, or $2,747.47, is also restored. The sum denied is thus reduced from $26,665.37 to $19,621.64.

### 12. *Fees Sought for Pre-Disclosure Statement Hearing Litigation*

The bulk of BI & L's fees were denied for work undertaken during a twenty-six day period in September and October, 1988, prior to a scheduled disclosure statement hearing which was to be held on October 12, 1988. A review of the bankruptcy court's order and the briefs filed by the parties reflects that $98,317.50 in fees and

---

**10.** Each of the latter two figures is inadvertently misstated by $100.00 in the bankruptcy court's Final Fee Order, 112 B.R. at page 806.

**11.** The use of a percentage figure serves the utilitarian purpose of eliminating fee application preparation requests to the extent they relate to activities found noncompensable.

$1,299.90 in expenses, aggregating $99,-617.40, were denied for that period. No enumeration of particular services rendered and fees denied in conjunction with those services is found, however, within the final fee order or the briefs submitted by the parties to this appeal.[12]

During the pre-disclosure statement period, BI & L served upon the DIP, the Trade Committee and the Bank Committee various motions, notices, objections and discovery requests, the "great majority" of which the bankruptcy judge ultimately concluded had been filed "purely for reasons of harassment, delay and intimidation." *See* Final Fee Order, 112 B.R. at 804.

In considering the compensability of BI & L's fee requests for September and October, 1988, the bankruptcy judge specifically analyzed, and in turn denied, all fees sought by BIL for work performed in conjunction with the filing on October 6, 1988, of an emergency motion in bankruptcy court for the appointment of an operating trustee, and for the two actions filed on September 19, 1988, in the Circuit Court of Putnam County, West Virginia (hereinafter, "Putnam litigation"). The Putnam litigation was filed by the Equity Committee and its members, Steven Mizel, Willard H. Erwin, Jr., and Allen S. Tauber, who were also individual stockholders. One action was a petition to compel Heck's to hold an annual stockholders' meeting pursuant to W.Va.Code § 31–1–18(c), and the other was a complaint against the officers and directors of Heck's which alleged post-petition breach of fiduciary duty, loyalty and good faith.

(a) Application for Appointment
of Operating Trustee

 The bankruptcy judge determined that work performed by BI & L relative to the emergency motion for appointment by the bankruptcy court of an operating trustee filed six days prior to the scheduled

hearing on the disclosure statement was "purely for reasons of harassment, delay and intimidation." Accordingly, all fees requested by BI & L in conjunction with that effort were denied. *See* Final Fee Order, 112 B.R. at 804.[13]

In support of its filing of the trustee motion, the Equity Committee submitted the affidavit of Melvin Rosenstrauch, a certified public accountant from the New York accounting firm of Laventhol & Horwath, which indicated that Heck's operating losses had dramatically accelerated in the period of June through September, 1988. The losses, the motion asserted, were due in part to a failed inventory purchase program which led to severe merchandise markdowns and dramatic decreases in gross margins, and to the inability of Heck's management to sell its merchandise at adequate levels of sales and gross margins to generate profitability. *See* Bankruptcy Docket No. 2490, citing Rosenstrauch Affidavit at ¶¶ 5–6. According to Rosenstrauch's affidavit, a combination of such factors led him to conclude that substantial operating losses would continue and that Heck's would shortly be forced into liquidation unless fundamental changes were immediately made in Heck's management and operations. *Id.* The Equity Committee further asserted that the facts and conclusions set forth by Rosenstrauch constituted "cause" for the immediate appointment of a Chapter 11 operating trustee on the grounds of incompetence or gross mismanagement of the affairs of the debtors by current management, 11 U.S.C. § 1104(a)(1), or, alternatively, as being in the interest of Heck's creditors and shareholders. 11 U.S.C. § 1104(a)(2). *See* Trustee motion at ¶ 5.

In denying all fees sought by BI & L for work on the trustee motion and supporting materials, the bankruptcy judge observed

**12.** In similar sweeping fashion, the bankruptcy court denied fees of BI & L for the services of its partner and lead counsel in this case, Robert Miller, for the period from June 1, 1988, to September 30, 1989, in the amount of $57,596. *See, infra,* p. 770.

**13.** Also filed was a motion for an expedited hearing on the issue, an affidavit of Laventhol & Horwath, accountants for the Equity Committee, and a memorandum of law. According to the bankruptcy judge's memorandum order, the motion for expedited hearing was granted and a hearing scheduled for October 11, 1988.

that Maarten Hemsley, Chief Financial Officer of Heck's, Inc., had filed a counter-affidavit in opposition to the trustee motion and accompanying Rosenstrauch affidavit, wherein Hemsley asserted that the conclusions of the Equity Committee and its accountants had damaged public and supplier confidence in Heck's and that the Rosenstrauch affidavit had set forth incorrect financial conclusions and projections due to inadequate communication with the DIP's accounting professionals. The bankruptcy judge further noted that Hemsley complained in his affidavit that counsel for the Equity Committee, by not filing the trustee motion under seal, caused to be published confidential financial information about the DIP in breach of a confidentiality agreement between the DIP and the Equity Committee's accountants. *See* Final Fee Order, 112 B.R. at 797, citing in support Bankruptcy Docket No. 2515, Exhibit E, paragraph 9. Exhibit E, however, is not a confidentiality agreement between those parties; rather, it merely contains the unilateral statement by Hemsley that certain information being furnished by him to various parties is "confidential."

Shortly after the filing of the trustee motion and the Putnam litigation, settlement discussions ensued between the parties in interest which resulted in an agreement being reached on a consensual plan of reorganization. According to BI & L, under that agreement, the distribution of common stock (including warrants) to Heck's shareholders increased from 10% to 35% of equity. The bankruptcy judge concluded, however, that the settlement in reality added little to the provisions already made for the shareholders. *See* Final Fee Order, 112 B.R. at 803–804. On the date of the October 11, 1988, expedited hearing on the trustee motion, BI & L announced to the bankruptcy court that the Equity Committee had entered into a compromise with the Trade and Bank Committees and the DIP that the trustee motion as well as the Putnam County litigation was being voluntarily withdrawn and that the hearing was unnecessary.

The merits of the Equity Committee's trustee motion were thus never resolved due to the settlement. Consequently, no hearing was held in order to resolve the factual disputes raised by the Hemsley and Rosenstrauch affidavits. In denying all fees sought by BI & L in conjunction with the filing of the trustee motion and supporting materials, the bankruptcy judge did not undertake to analyze the actions of the Equity Committee's counsel in relation to the powers and duties vested in the committee under 11 U.S.C. § 1103(c)(4), pursuant to which such a committee is expressly empowered to seek appointment of a trustee, nor in relation to the standards set forth in 11 U.S.C. § 1104 relative to a resolution on the merits. Instead, only selected portions of the Hemsley affidavit are referenced in support of the conclusion that the trustee motion was "filed without reasonable preparation by BI & L," and "purely for reasons of harassment, delay and intimidation." Final Fee Order, 112 B.R. at 804. The final fee order purports to base the denial of fees upon the bankruptcy judge's tacit acceptance of the Hemsley affidavit over that of the Equity Committee's accountants, and the bankruptcy judge's speculation as to ·how the merits of the trustee motion would have been ruled upon had it not been voluntarily withdrawn as a result of the parties' settlement.

◼ Chapter 11 of the Bankruptcy Code is designed to allow the debtor-in-possession to retain management and control of the debtor's business operations unless a party in interest can prove that the appointment of a trustee is warranted. *See, e.g., In re Ionosphere Clubs, Inc.,* 113 B.R. 164 (Bkrtcy.S.D.N.Y.1990). The appointment of a trustee in a chapter 11 case is an extraordinary remedy, and there is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee. *Committee of Dalkon Shield Claimants v. A.H. Robins Co.,* 828 F.2d 239, 241 (4th Cir.1987).

Pursuant to the express provisions of 11 U.S.C. § 1103(c)(4), however, a committee appointed under section 1102 may "request the appointment of a trustee or examiner under section 1104 ..." Section 1104 of

the Code provides the standards to be followed by the court in determining whether appointment of a trustee is warranted:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1) & (2). The Fourth Circuit has observed that the concepts of incompetence, dishonesty, gross mismanagement and fraud as contemplated by section 1104(a)(1) all cover a "wide range of conduct," and that "[i]mplicit in a finding of incompetence, dishonesty, etc., for purposes of section 1104(a)(1), is whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee." *Dalkon Shield Claimants*, 828 F.2d at 242.

■ In situations in which a creditor or party in interest is of the view that a debtor-in-possession is improperly exercising the trustee's powers accorded under the Code, the proper course is to petition the bankruptcy court for appointment of a trustee or examiner. *See In re Brookfield Clothes, Inc.*, 31 B.R. 978 (S.D.N.Y.1983). Here, the Equity Committee sought such an appointment after its court-appointed accountants, Laventhol & Horwath, advised the committee that Heck's was, among other things, suffering massive losses and that its current management was unable to make reliable financial forecasts. On the basis of that information

and upon the direction of the Equity Committee, BI & L acted well within the committee's statutory authority set forth in 11 U.S.C. § 1103 to seek the appointment of a trustee. Indeed, BI & L persuasively maintains that subsequent events have proven that Laventhol was right inasmuch as approximately two months after confirmation of the plan in 1989, Heck's "decided to abandon its retail operations and 'sold' all of its retail operations for $1 more than its debt." BI & L states:

> As reported in Heck's 1990 proxy statement, it did so because the retail stores continued to lose money—suffering operating losses of $9.8 million for the third quarter ending November 25, 1989. Heck's management admitted that the company would likely have been forced into liquidation if the "sale" did not occur.

*See* Brief of BI & L at p. 12, n. 7.

Inasmuch as the Equity Committee had the statutory right to seek the appointment of a trustee under 11 U.S.C. §§ 1103 and 1104, and finding no adequate factual basis upon which to conclude that the committee's efforts were motivated by an improper rather than legitimate purpose, the court concludes that BI & L's efforts in that regard were compensable and that the bankruptcy court's conclusion otherwise must be reversed.

#### (b) Application to Compel Annual Stockholders Meeting

■ The bankruptcy court also denied all fees requested by BI & L for actions taken in Putnam County Circuit Court which sought in part to compel the holding of an annual stockholders' meeting. In doing so, the bankruptcy judge acknowledged that stockholders have a right to meet and elect directors during reorganization, and that a bankruptcy court should not lightly employ its equitable powers to block an election of a new board of directors. *See* Final Fee Order, 112 B.R. at 798. The bankruptcy judge concluded, nonetheless, that, inasmuch as Congress has given district courts jurisdiction of the Chapter 11 process, "[w]here the purpose of the action to call a meeting of sharehold-

ers is to preempt the Chapter 11 reorganization process itself, courts must exercise common sense control." *Id.* The court, without citing decisional support for its conclusion, then held:

This Court holds that where a debtor in possession properly and in good faith places before the court a plan which proposes to dilute or extinguish the interests of its existing shareholders, then the right to select the directors of that debtor in possession is in litigation under the exclusive jurisdiction of the district court, inextricably tied to the confirmation process. Where a properly filed plan is before the court, and the right to issue voting stock and select directors is being litigated in the confirmation process, the exclusive jurisdiction of the federal court precludes an official committee in the case or its court-appointed professionals from attacking the plan in state court. To allow the shareholders under these conditions to elect directors at a meeting of shareholders would frustrate Congress' grant of exclusive jurisdiction to the district courts in 28 U.S.C. § 1334 and would subvert the bankruptcy process.

*See* Final Fee Order, 112 B.R. at 801 (footnote omitted).

Based upon the conclusion that "an equity committee has no right to put the reorganization process at risk by a state court proceeding," the bankruptcy judge thus determined that Equity Committee counsel has no right to demand payment for initiating the proceeding for the purposes of compelling a shareholders' meeting. The final fee order thus denied all compensation to BI & L in conjunction with the effort to compel a shareholder meeting as improper and thus unnecessary. *Id.* at 801.

In support of its request in state court for Heck's to call and hold an annual shareholders' meeting, the Equity Committee, through its counsel, relied upon both W.Va. Code § 31-1-18 and the by-laws of the Heck's corporation. *See* Verified Application for Summary Order Compelling Heck's, Inc. to Call and Hold an Annual Shareholders' Meeting, attached as exhibits

to Adversary Proceeding No. 88-0152. The state statute relied upon by the Equity Committee provides in pertinent part:

(b) An annual meeting of the shareholders or members shall be held at such time as may be stated in, or fixed in accordance with, the bylaws. Failure to hold the annual meeting at the designated time shall not work a forfeiture or dissolution of the corporation.

(c) In the case of a business corporation, if the annual meeting is not held within any thirteen-month period, the circuit court of the county wherein the place of the principal office of the corporation is located, or the circuit court of Kanawha county in the case of corporations not having a principal office in this State, may, on the application of any shareholder, summarily order a meeting to be held.

W.Va.Code § 31-1-18(b) & (c).

Article II, section 1 of Heck's by-laws provides further support for the Equity Committee's position regarding the necessity of annual meeting of shareholders:

Section 1. *Annual Meetings.* The annual meeting of the stockholders shall be held on the fourth Monday in April of each calendar year ..., at 11 o'clock in the forenoon, or as soon thereafter as the stockholders shall assemble, at the principal office of the Corporation at HUB Industrial Park, McJunkin Road, Nitro, West Virginia, Putnam County, West Virginia, or such other place, either within or without the State of West Virginia, as the Board of Directors shall, from time to time, determine.

*See* attachments to Adversary Proceeding No. 88-0152.

In its application to compel a shareholder meeting, the Equity Committee and several individual shareholders asserted that the last shareholder meeting of Heck's had been called on April 28, 1986, approximately twenty-nine months prior to the filing of the application. Arguing that Heck's was thus in clear violation of both West Virginia law and its own corporate by-laws, the Equity Committee sought an order from the Circuit Court of Putnam County to

compel the holding of such a meeting in accordance with W.Va.Code § 31–1–18(b) and (c).

No cases have been found to support the conclusion set forth in the final fee order that the shareholders' right to select directors of the corporation falls within the exclusive jurisdiction of the district court. To the contrary, the Second Circuit has acknowledged the "well-settled rule that the right to compel a shareholders' meeting for the purpose of electing a new board of directors subsists during reorganization proceedings." *In re Johns–Manville Corp. v. Equity Security Holders Committee*, 801 F.2d 60, 64 (2d Cir.1986), citing *In re Bush Terminal Co.*, 78 F.2d 662, 664 (2d Cir.1935); *In re Saxon Industries*, 39 B.R. 49, 50 (Bkrtcy.S.D.N.Y.1984); and *In re Lionel Corp.*, 30 B.R. 327, 330 (Bkrtcy. S.D.N.Y.1983).

In *Manville*, a Chapter 11 debtor sought injunctive relief in bankruptcy court seeking to enjoin an action filed in Delaware state court by an equity committee. In the state action, the equity committee sought to compel the debtor to hold a shareholders' meeting as required by a Delaware statute requiring such meetings annually. 801 F.2d 60. In enjoining the state court action, the *Manville* bankruptcy court reasoned that "any shareholder meeting and ensuing proxy fight has the potential to derail the entire Manville reorganization with devastating consequences," or would "at least ... delay or halt plan negotiations." 801 F.2d at 64. Similarly, the district court upheld the injunctive relief granted by the bankruptcy court, concluding that the equity committee had been motivated by a desire to "torpedo the reorganization or to acquire a bargaining chip in aid of its negotiation power." *Id.*

In resolving the propriety of the injunctive relief granted by the bankruptcy court

and affirmed by the district court, the Second Circuit recognized in *Manville* that the right of shareholders to govern their corporation is a prerogative ordinarily uncompromised by reorganization, and that, as a consequence, "a bankruptcy court should not lightly employ its equitable power to block an election of a new board of directors." 801 F.2d at 64. The Second Circuit also concluded that the equity committee's right to compel a shareholders' meeting under Delaware state law "may be impaired only if the Equity Committee is guilty of 'clear abuse' in attempting to call one." 801 F.2d at 64, citing *In re J.P. Linahan, Inc.*, 111 F.2d 590, 592 (2d Cir. 1940). The Second Circuit concluded:

> [W]e cannot agree that the Equity Committee's professed desire to arrogate more bargaining power in the negotiation of a plan—in contrast to some secret desire to destroy all prospects for reorganization—may in itself constitute clear abuse.
>
> . . . .
>
> [T]he shareholders' mere intention to exercise bargaining power—whether by actually replacing the directors or by "bargaining away" their chip without replacing the board, as the district court suggests they may have wished to do—cannot without more constitute clear abuse. Unless the Equity Committee were to bargain in bad faith—*e.g.* to demonstrate a willingness to risk rehabilitation altogether in order to win a larger share for equity—its desire to negotiate for a larger share is protected.

801 F.2d at 64–65.[14]

■ Here, the bankruptcy court concluded that the Equity Committee had "no right to put the reorganization process at risk by a state court proceeding," and thus denied, as improper and unnecessary, all

---

14. The Second Circuit thus remanded the question of "clear abuse," noting that the lower court should not focus upon the equity committee's conceded desire to enhance its bargaining position, but should instead "analyze the real risks to rehabilitation posed by permitting the equity committee to call a meeting of shareholders for the purpose of compelling reconsideration of Manville's presently proposed plan." 801 F.2d at 69. On remand, the bankruptcy court found that the committee's actions in seeking to compel a shareholders' meeting were clear abuse, finding that the committee acted in "utter disregard of the devastating consequences of its conduct," and that it was "willing to risk the Debtor's rehabilitation altogether," motivated by an "intent to jeopardize the reorganization." *See* 66 B.R. 517, 542 (Bkrtcy.S.D.N.Y.1986).

fees requested by BI & L for services provided to the Committee in conjunction with the application to compel a shareholders' meeting. The teaching of *Manville,* however, dictates a different result. Pursuant to the rationale of *Manville,* even if the Equity Committee's efforts were motivated by a desire to arrogate more bargaining power to itself and to use the threat of a new board "as a lever vis-a-vis other interested constituencies and vis-a-vis the current ... board," such conduct, without more, simply does not constitute the clear abuse sufficient to preclude the stockholders from exercising their right, under state law, to elect a new board of directors. *See Johns–Manville,* 801 F.2d at 65. As held in *Manville,* in order to find clear abuse on the part of the Equity Committee and its counsel, their action in seeking to compel a shareholders' meeting must have been motivated by a bad faith desire to risk rehabilitation altogether rather than merely an effort to achieve greater bargaining power or to advance a plan more favorable to equity. Finding no basis upon which to conclude that the Equity Committee's action, and in turn the services of BI & L, in seeking to compel a shareholders' meeting manifested clear abuse or a bad faith "willingness to risk rehabilitation altogether in order to win a larger share for equity," the bankruptcy court's denial of fees to BI & L in that regard is reversed.

#### (c) State Court Action Against Officers and Directors

The bankruptcy court also denied all fees and expenses sought by BI & L in conjunction with the filing of a complaint in Putnam County, West Virginia, by the Equity Committee and several individual shareholders against Heck's officers and directors. In doing so, the bankruptcy judge observed that the Putnam litigation concerned allegations of breach of fiduciary duty, loyalty and good faith against the

officers and directors, and that the Equity Committee had cited, in support of those allegations, "many actions which the directors took as part of their efforts to advance a confirmable Chapter 11 plan." *See* Final Fee Order, 112 B.R. at 802.[15] The bankruptcy judge concluded:

The plan litigation process in this Court was the only forum in which Equity Committee's counsel could properly raise concerns about the above issues as they related to shareholders' treatment under the Plan or management's stewardship of the corporation. This is not to say that the individual shareholders have no right to obtain private counsel and bring a state action against directors and officers for actual wrongdoing. That question is not before the Court in this case. The Equity Committee agreed to drop its state damage action 25 days after it was filed as part of an attempt to have this Court approve 80% of BIL fees billed during the June–October, 1988 period. The sole motivation for bringing this complaint seems to have been to obstruct the Plan confirmation process.

*See* Final Fee Order, 112 B.R. at 802.

Stating in the final fee order that a review of Bankruptcy Code §§ 1103(c) and 1109(b) renders it clear that BI & L had led the Equity Committee outside the parameters of its authorized mission, violated the district court's exclusive jurisdiction, and introduced unnecessary expense and confusion into the case, the bankruptcy court held that BI & L's work in bringing the directors' action was frivolous, improper, and brought for an improper purpose. All fees sought by BI & L in conjunction with the directors' action were thus denied as unnecessary. *See* Final Fee Order, 112 B.R. at 803.

No authority is cited by the bankruptcy court in support of its holding that it was the only forum in which the Equity Com-

**15.** Particularly, the bankruptcy judge noted that the Equity Committee and individual shareholder plaintiffs had alleged that Heck's senior management was proposing a self-serving plan which diluted shareholder interests, that the plan proposed would wrongfully entrench the defendant officers and directors in the reorga-

nized corporation as a result of lucrative management contracts provided for thereunder. The complaint also cited the defendant officers and directors as having failed to pursue preference and fraudulent conveyance claims against certain banks. *See* Final Fee Order, 112 B.R. at 802.

mittee could make claims against Heck's officers and directors for breach of state law fiduciary duties owed Heck's shareholders. Although BI & L acknowledges that a review of case law establishes that state court litigation against officers and directors of a Chapter 11 debtor may be enjoined by the bankruptcy court once filed, BI & L contends that cases such as *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1007 (4th Cir.1986), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1987); and *Johns–Manville Corp. v. Asbestos Litigation Group,* 33 B.R. 254, 262–63 (Bkrtcy.S.D.N.Y.1983), clearly recognize that such suits may be brought in state court and are not within the exclusive jurisdiction of the bankruptcy or federal district courts.

In *A.H. Robins v. Piccinin,* a Chapter 11 debtor filed an adversary proceeding naming as defendants the plaintiffs in several suits which were pending in various state and federal courts. 788 F.2d 994. The adversary proceeding initiated by Robins sought injunctive relief in district court in order to restrain the prosecution of the state actions against its co-defendants.[16] In certain of the cases where injunctions were issued, the co-defendants included Robins management who, the court noted, were "entitled to indemnification by the debtor under the corporate by-laws and the statutes of Virginia...." 788 F.2d at 1007.

Relying upon the rationale of *In re Johns–Manville Corp.,* 33 B.R. 254 (Bkrtcy.S.D.N.Y.1983) in which various state court actions against officers, directors, and employees of a Chapter 11 debtor were enjoined by a New York bankruptcy court,[17] the Fourth Circuit concluded that the issuance of injunctive relief was proper. The *Piccinin* court reasoned in part that successful suits against Robins managers, who were entitled to indemnity under corporate by-laws and insured status under Robins' insurance policy, would adversely affect the property of the debtor to the detriment of the debtor's creditors as a whole.[18]

Implicit in the *Manville* and *Piccinin* decisions is the recognition that litigation may be initiated against the officers and directors of a Chapter 11 debtor in state court during the course of reorganization proceedings, and no basis is found within the rationale of either decision to suggest that the granting of injunctive relief in those cases was in any way predicated upon a determination that such actions violated the exclusive jurisdiction of the bankruptcy or district courts. It is seen, however, that neither the *Manville* or *Piccinin* decision concerned the precise issue now before the court, namely, the propriety of an official committee's filing, without leave of the bankruptcy court, a state court ac-

---

**16.** Prior to filing for Chapter 11 relief, A.H. Robins had been sued in thousands of cases for injuries allegedly resultant from the use of the Dalkon Shield contraceptive device. In approximately one-half of the cases, other defendants, including corporate management, were named as defendants along with Robins. After the filing of Robins' Chapter 11 petition, a number of plaintiffs in suits where defendants other than Robins were named sought to sever their actions against Robins and proceed against the remaining named defendants. Adversary proceedings brought to enjoin plaintiffs in eight such suits from proceeding to litigate against Robins' co-defendants were at issue in the *Piccinin* case. *See* 788 F.2d at 996–97.

**17.** The Fourth Circuit noted that, in *Johns-Manville,* the bankruptcy court had found that:

In the event of a recovery against the past or present officers, directors or employees of Manville in any of the pending 1,000 cases,

Manville's insurers may be called upon to indemnify such officers, directors and employees under the provision of the policies issued by them to Manville. If such insurers are called upon to make such indemnification payments, those payments may cause an asset of the Manville estates to be diminished.
788 F.2d at 1006, citing 33 B.R. at 261.

**18.** The court concluded:

It seems incontestable that, if the suits are permitted to continue ... any effort at reorganization of the debtor will be frustrated, if not permanently thwarted. It is obvious from the record that if suits are permitted to proceed against indemnitees on claims on which the indemnitees are entitled to indemnity by Robins, either a binding judgment against the debtor will result or ... inconsistent judgments will result, calling for the exercise of the court's equitable powers.
788 F.2d at 1008.

tion against the officers and directors of the debtor during the course of the reorganization process.

The Second Circuit has observed that the Bankruptcy Code provides the trustee with explicit power to sue and that the trustee can thus initiate suit without court approval to avoid a preferential transfer of assets, "although it is considered the better practice to secure an order of the court for leave to sue." *In re STN Enterprises v. Noyes*, 779 F.2d at 904, citing 4 *Collier on Bankruptcy*, ¶ 547.52[3], at 547–180 (15th ed. 1979). The Second Circuit has also recognized that the Bankruptcy Code contains no explicit authority for creditors' committees to initiate adversary proceedings, but notes:

> Most bankruptcy courts that have considered the question have found an implied, but qualified, right for creditors committees to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. § 1103(c)(5) and 1109(b), or in reliance on an implied continuation of creditors' committee powers under the pre–1978 Code. These courts have allowed creditors' committees to initiate proceedings only when the trustee or debtor-in-possession unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer. We agree with these bankruptcy courts that 11 U.S.C. § 1103(c)(5) and 1109(b) imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court.

779 F.2d at 904 *citing Matter of Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bkrtcy. S.D.N.Y.1982); *In re Toledo Equipment Co., Inc.*, 35 B.R. 315, 317–20 (Bkrtcy. N.D.Ohio 1983); *Matter of Monsour Medical Center*, 5 B.R. 715, 718 (Bkrtcy. W.D.Pa.1980).

In *STN Enterprises*, the Second Circuit remanded for further consideration of the unsecured creditor committee's allegations that the debtor in possession had unjustifiably failed to initiate a suit against the corporate director, stating:

> In order to decide whether the debtor unjustifiably failed to bring suit as to give the creditors' committee standing to bring an action, the court must also examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claims(s) is likely to benefit the reorganization estate.

779 F.2d at 905, citing *Toledo Equipment Co., Inc.*, 35 B.R. at 320.

The Second Circuit further indicated that, upon remand, the bankruptcy or district court should consider the probabilities of legal success in the suit sought to be initiated, and the probable recovery therefrom as well as "whether it would be preferable to appoint a trustee in lieu of the creditors' committee to bring suit … and the terms relative to attorneys' fees on which suit might be brought." 779 F.2d at 905. The court reasoned:

> The creditors who compose the committee might agree themselves to be responsible for all attorneys' fees, but if they would seek to impose such fees on other creditors or the chapter 11 estate, whether by contingent fee arrangement or otherwise, that would obviously affect the cost-benefit analysis the court must make in determining whether to grant leave to sue. Hence fee arrangements should not only be made a matter of record but should be carefully examined by the court as it makes that determination.

779 F.2d at 905.

Similarly, in *In re Toledo Equipment Co., Inc.*, an unsecured creditor's committee filed an adversary complaint seeking to recover allegedly preferential transfers. 35 B.R. 315. Although concluding that the creditors' committee did not have standing to bring such an action under the facts before it, the court nonetheless recognized that the Code establishes creditors committees for the purpose of protecting the rights of the committee's constituents and similarly situated creditors, and that to allow such committees to bring such actions where appropriate would correspond with the Code's intention that the committee protect the rights of its members, "especially where the debtor-in-possession's inac-

tivity impinges on those rights." 35 B.R. at 318. The court also observed:

It should be noted that there is nothing in those sections [§§ 1103 & 1109] which prevents a Committee from filing an adversary complaint. The Code does not limit the committee's authority to issues which arise only in the context of the primary bankruptcy case.

35 B.R. at 319, citing *Matter of Marin Motor Oil, Inc.*, 689 F.2d 445 (3rd Cir. 1982).

As did the Second Circuit in *STN Enterprises*, the bankruptcy court in *In re Toledo Equipment* explained that a creditor committee's standing to bring an action is triggered "only if it would benefit the estate and if the debtor-in-possession has unjustifiably failed to prosecute the case." 35 B.R. at 319. Noting that a committee's inherent motive in bringing a suit is the desire to recover funds from which creditors can be paid, the court recognized that conflicts may exist between the creditor's right to be paid and the debtor-in-possession's effort to reorganize, and that, pragmatically, the problem was "whether the creditor's committee may instigate an action on behalf of the estate, subject to subsequent objection, or whether it should be required to apply with the Court for leave to file the action." *Id.*

Recognizing that resolution of the issue before it required a balancing of the competing interests in order to determine whether or not the debtor-in-possession's failure to bring the action was justifiable, the *Toledo Equipment* court held:

If the unsecured creditor's committee were permitted to institute a suit against a creditor without a prior determination as to the propriety of the debtor-in-possession's failure to sue, the resulting suit could seriously jeopardize the debtor's relationship with the creditor, and thereby jeopardize the chances for successful reorganization. If the committee were required to seek prior Court approval, a determination as to the debtor's failure to act could be made before the debtor-creditor relationship was endangered. In view of the relative merits of each alternative, it must be concluded that a creditor's committee should be required to seek Court approval prior to beginning an action on behalf of the estate. This requirement would not deprive the committee of any right to raise and be heard on any issue. It would only require a prior determination of whether or not the right exists.

35 B.R. at 320.

In the present case, the Equity Committee and individual shareholders, through BI & L, filed a state court action against the officers and directors of Heck's without seeking prior leave of the bankruptcy court. As a consequence, the bankruptcy court was deprived of the opportunity to weigh the relative risks and benefits of the action to the reorganization estate, and to consider, *inter alia*, whether it would be preferable to appoint a trustee in lieu of the committee to bring suit. *See, e.g., In re STN Enterprises*, 779 F.2d at 905. *See also, In re Savino Oil & Heating Co., Inc.*, 91 B.R. 655 (Bkrtcy.E.D.N.Y. 1988); *In re Evergreen Valley Resort, Inc.*, 27 B.R. 75 (Bkrtcy.D.Me.1983). Although the cases discussed have involved actions taken on behalf of creditor committees, the court perceives no reason to apply a different rule to the Equity Committee here.

Moreover, had the Equity Committee and its counsel sought leave of court to file the Putnam County action against the officers and directors, the bankruptcy court would likewise have had an opportunity to consider the terms relative to the attorneys fees sought by BI & L in conjunction with the officers and directors action, namely, its intent to ultimately seek to impose such fees on the Chapter 11 estate, in making its cost-benefit analysis. *Id.*

The Equity Committee, in striking off on its own, commenced a fruitless action that was abandoned in just three weeks in favor of a settlement that left the very same officers and directors fully entrenched and wholly untouched. Inasmuch as the Equity Committee failed to seek leave of court prior to instituting that action, the denial of

fees to BI & L in connection therewith was not clearly erroneous.

The bankruptcy court has not allocated the fees and expenses sought by BI & L in the total amount of $99,617.40 among the action against the officers and directors, the trustee motion, the shareholder meeting petition and other services. The parties to this appeal, however, consisting of the Equity Committee, BI & L, the United States Trustee and the Bank Creditors Committee, have stipulated that $13,172.00 is applicable to the action against the officers and directors and the balance of $86,-445.40 is applicable to the trustee motion and shareholder meeting petition and other BI & L services. In accordance with the court's resolution of those matters on appeal, BI & L is entitled to receive $86,-445.40 therefor and is denied the balance of $13,172.00.

## IV. *Sanctions*

### A. The $91,582.25 Indemnification

The bankruptcy judge, citing Bankruptcy Rule 9011, not only denied fees to BI & L relative to all aspects of the Putnam County litigation and the motion to appoint an operating trustee, but also reduced fees otherwise deemed allowable in the sum of $91,582.25. According to the final fee order, that amount represented the sum which Heck's was required to pay in order to indemnify its officers and directors for attorney fees to defend the Putnam County damage action against them. *See* Final Fee Order, 112 B.R. at 803, 804.

The parties to this appeal have stipulated that the indemnification of $91,582.25 is.

allocable as follows: $82,482.25 to the action against the officers and directors and $9,100.00 to the other matters. In addition, BI & L and the Equity Committee further agree that the reasonableness of the amount of the indemnification is not contested.

In this appeal, BI & L presents a three-fold argument in opposition to the imposition of sanctions by the bankruptcy judge. BI & L first argues that the bankruptcy court exceeded its jurisdiction and the boundaries of Rule 9011 in sanctioning it for conduct in the state courts and in advising its client. Secondly, BI & L contends, it was improperly sanctioned in a sum equal to the $91,582.25 for which the DIP indemnified its officers and directors, arguing that the officers and directors had no right to indemnification in the first instance. Finally, BI & L contends, it was denied due process with respect to the sanctions levied in the final fee order inasmuch as the bankruptcy court failed to give BI & L either notice or an opportunity for hearing before imposing sanctions under Rule 9011.

### 1. *Bankruptcy Rule 9011*

Rule 9011 is relied upon by the bankruptcy judge in support of his denial of fees otherwise allowed to BI & L in the amount of $91,582.25. Rule 9011 is derived from Rule 11 of the Federal Rules of Civil Procedure, *see generally* 9 Collier on Bankruptcy, ¶ 9011.02.[19]

19. Rule 9011 provides in pertinent part:
 *(a) Signature.* Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, ... shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. The signature of an attorney or party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case. The rule further provides that if a document is signed in violation of the rule, the court on motion or on its own initiative "shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties *the amount of the reasonable expenses* incurred because of the filing of the document, including a reasonable attorney's fee." Bankruptcy Rule 9011.

■ A plain reading of Bankruptcy Rule 9011 supports BI & L's position that the bankruptcy court could not properly predicate its imposition of sanctions against BI & L for actions taken in state court or upon conduct in which no pleading, petition, motion or other paper was improperly filed in bankruptcy court. As the Fourth Circuit noted in a case concerning the scope of Rule 11, from which Bankruptcy Rule 9011 is taken:[20]

> By its terms, Rule 11 provides for sanctions when a pleading is signed "in violation of this rule." At the time a state court pleading is signed, the signing attorney is not subject to the Federal Rules of Civil Procedure. Therefore, a pleading signed in a state court proceeding which is later removed to federal court clearly cannot be signed in violation of Rule 11.

*Kirby v. Allegheny Beverage Corp.*, 811 F.2d 253, 257 (4th Cir.1987). *See also, Hurd v. Ralphs Grocery Co.*, 824 F.2d 806, 808 (9th Cir.1987) (under Rule 11, "sanctions cannot be imposed … for filing a paper in state court"); *Brown v. Capitol Air, Inc.*, 797 F.2d 106, 108 (2d Cir.1986) (Rule 11 "does not purport to authorize sanctions for actions taken in state courts").

Accordingly, the bankruptcy court's reliance upon Rule 9011 as support for the imposition of sanctions against BI & L is misplaced to the extent that the allegedly improper actions taken and papers filed by BI & L occurred entirely in Putnam County Circuit Court rather than in the bankruptcy court. It is seen, however, that a number of pleadings were eventually filed by BI & L in bankruptcy court pertaining to the pendency of the state court application to compel a shareholders' meeting and to the state damage action against Heck's officers and directors. *See* Bankruptcy Docket No. 2859, Adversary Proceeding No. 88–0152.[21]

■ Nonetheless, only those bankruptcy court pleadings pertaining to the state action against the officers and directors, which this court has previously concluded were improperly taken by BI & L on behalf of the Equity Committee, may serve as a basis for sanctions under Rule 9011. Having previously concluded that BI & L did not improperly act on behalf of the Equity Committee in seeking to compel a shareholders' meeting in state court, no pleadings subsequently filed in federal or bankruptcy court pertaining to that action may properly serve as a basis for sanctions under Rule 9011. Only one bankruptcy court pleading has been identified to the court which pertains to the Equity Committee's improper filing of the officers and directors action in state court, without leave of the bankruptcy court. *See* Bankruptcy Docket No. 2859.

■ It is well-recognized, however, quite apart from Rule 9011, that courts have the inherent authority to impose sanctions upon counsel who is found to have acted in bad faith, vexatiously, wantonly or for oppressive reasons, *see, e.g., Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Alyeska Pipeline Services Co. v. Wilderness Services*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and that courts may impose excess costs, expenses and fees, pursuant to 28 U.S.C. § 1927, upon counsel who multiplies the proceedings in an action "unreasonably and vexatiously." *See* 28 U.S.C. § 1927. *See also, Blair v. Shenan-*

---

**20.** It is recognized that "cases interpreting Rule 11 are equally applicable to Bankruptcy Rule 9011." *See Matter of King*, 83 B.R. 843, 846 (Bkrtcy.M.D.Ga.1988); *Styler v. Tall Oaks, Inc.*, 93 B.R. 263, 266 (Bkrtcy.D.Utah 1988).

**21.** Bankruptcy Docket No. 2859 pertained to both the Equity Committee's application for a shareholders' meeting and its complaint against the Heck's officers and directors, and is entitled "Response of Official Committee of Equity Security Holders and Berlack, Israels & Liberman in

Support of Standing to File Shareholders' Meeting Motion and Verified Complaint Against Heck's Officers and Directors in West Virginia State Court." Adversary Proceeding No. 88–0152, on the other hand, pertained solely to the Equity Committee's application in state court to compel a shareholders' meeting, eventually removed by Heck's to federal court. Following removal, four separate pleadings were filed by BI & L on behalf of the Equity Committee in that proceeding.

*doah Women's Center, Inc.*, 757 F.2d 1435, 1437 (4th Cir.1985); *Jones v. Pittsburgh National Corp.*, 899 F.2d 1350, 1358 (3rd Cir.1990); *Peoro v. Eisenman*, 793 F.2d 1048 (9th Cir.1986).[22] Although the bankruptcy court referred only to Rule 9011 for the imposition of sanctions upon BI & L, it is quite clear that such sanctions may be properly levied to the extent that BI & L's conduct, relative to the bringing of the directors' action in state court without leave of the bankruptcy court, rose to that level of misconduct required to support the imposition of sanctions under either the court's inherent authority or under § 1927.

### 2. Heck's Authority to Indemnify

█ BI & L further contends that the officers and directors had no right to indemnification in the first instance and, consequently, no proper expense was borne by the Heck's estate with regard to the indemnification issue which would justify the bankruptcy court's decision to sanction BI & L for the expense of indemnification.

The bankruptcy court's order directing the indemnification was made following Heck's application seeking authority to pay the attorneys' fees and expenses of Myerson & Kuhn, counsel for Heck's officers and directors in the Putnam litigation, as an expense of administration pursuant to section 503(b)(1)(A) of the Bankruptcy Code. In support of its application, Heck's noted that its Articles of Incorporation, Article VII, as amended June 29, 1966, give the officers and directors of Heck's an absolute right to indemnification,[23] and, further, that such indemnification provisions are wholly consistent with West Virginia law. *See* Bankruptcy Docket no. 2906; *See also* W.Va.Code § 31-1-9.[24]

Numerous courts have denied administrative expense priority under § 503(b)(1)(A) to corporate officials seeking indemnification under the provisions of corporate by-laws when it is determined that the acts or services which gave rise to the claims occurred before rather than after the filing of the petition for relief in bankruptcy. *See, e.g. In re Philadelphia Mortgage Trust*, 117 B.R. 820 (Bkrtcy.E.D.Pa. 1990), *citing In re Amarex*, 853 F.2d 1526 (10th Cir.1988); *In re Christian Life Center*, 821 F.2d 1370 (9th Cir.1987); *Guaranty National Ins. Co. v. Greater Kansas City Transp. Inc.*, 90 B.R. 461, 462–63 (D.Kan.1988); *Matter of Baldwin–United Corp.*, 43 B.R. 443 (S.D.Ohio 1984); *In re Consolidated Oil & Gas, Inc.*, 110 B.R. 535 (Bkrtcy.D.Colo.1990); and *In re Amfesco Industries, Inc.*, 81 B.R. 777, 780–85 (Bkrtcy.E.D.N.Y.1988).

In *Baldwin–United Corp.*, the case relied upon by BI & L, the court considered whether indemnification of corporate directors for legal expenses incurred in defending suits which challenged their activities while serving the corporation would be entitled to administrative expense priority under § 503. 43 B.R. 443, 447.[25] In ana-

---

**22.** The statute, 28 U.S.C. § 1927, provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (1982).

**23.** The provision of the Articles of Incorporation relied upon provide for indemnification of an officer, director or employee "against any and all liability and reasonable expense that may be incurred by him in connection with or resulting from any claim, action, suit, or proceeding ... in which he may become involved, as a party or otherwise, by reason of his being or having been a director, officer or employee of the corporation...." *See* Bankruptcy Docket No. 2906.

**24.** West Virginia Code § 31-1-9 provides in pertinent part that a corporation shall have power to "indemnify any person who was or is a party or is threatened to be made a party to any ... action or proceeding ... by reason of the fact that he is or was a director, officer, employee or agent of the corporation," and that "expenses (including attorney fees) incurred in defending a civil or criminal action ... may be paid by the corporation in advance of the final disposition of the action." W.Va.Code § 31-1-9.

**25.** In *Baldwin*, the by-laws of the debtor provided, *inter alia*, that the company "may indemnify ... any person who was or is a party ... to any ... suit ... by reason of the fact that he is or was a director, officer, employee or agent of the company." *See* 43 B.R. at 446.

lyzing the issue, the court divided the directors seeking indemnification into two groups, one comprised of the corporation's former directors and one consisting of the present directors.

In denying administrative priority to the claims of the former officers and directors, the *Baldwin* court noted that the claim did not arise from a transaction with the debtor-in-possession and that the obligation to indemnify had fully matured pre-petition in that the former officers and directors' performance for the debtors was complete at the time the petitions were filed. *Id.* at 454. As to the present directors, the court remanded the issue for a determination by the bankruptcy court as to whether the test set forth in *In re Mammoth Mart,* 536 F.2d 950 (1st Cir.1976), a leading case concerning administrative expense priority, had been met. On remand, the bankruptcy court was to consider whether the claim (1) arose from a transaction with the debtor-in-possession and (2) was beneficial to the debtor-in-possession in the operation of the business. 43 B.R. at 461, citing *Mammoth Mart,* 536 F.2d at 954.

In *Consolidated Oil & Gas,* a Colorado bankruptcy court concluded that claims of former officers and directors for indemnification of fees and expenses incurred in a mismanagement suit commenced after the bankruptcy case was filed were not entitled to administrative expense priority, finding that the officers and directors did not perform any services for the debtor-in-possession or provide other post-petition consideration. 110 B.R. at 538. The court noted that the claimants rendered only pre-petition services to the debtor, and that its denial of administrative expense priority was consistent with the holding in *In re Amfesco,* 81 B.R. 777 (Bkrtcy.E.D.N.Y. 1988).

In the *Amfesco* case, former directors of a bankruptcy debtor sought indemnification of legal expenses under the debtor's articles of incorporation. The *Amfesco* court denied administrative expense priority notwithstanding the provisions of the articles of incorporation, reasoning that:

All of the operative facts, legal relationships, and conduct of the Applicants upon which is based the threatened litigation occurred pre-petition. The indemnification agreement entered into between the Applicants and the Debtors occurred pre-petition. Any duty of the Debtors arises from services provided to the pre-petition Corporation not for services rendered post-petition to the Debtors-in-Possession. As such, the Applicants' legal fees claim arises from their pre-petition services rather than any post-petition services.

81 B.R. at 784, citing *In re Christian Life Center,* 821 F.2d 1370, at 1374 (9th Cir. 1987). *See also, In re Philadelphia Mortgage Trust,* 117 B.R. 820, 830 (Bkrtcy. E.D.Pa.1990).

In the present case, the Putnam litigation was instituted on September 19, 1988, by the Equity Committee against Heck's officers and members of its Board of Directors, John R. Isaac, Jr, Maarten D. Hemsley, Katy M. Hurley, and William K. Bragg, Jr., all of whom were engaged by Heck's after the Chapter 11 case was filed, and two other directors, Brenda Cole and Gerald A. Eppner, alleging post-petition breach of fiduciary duty, loyalty and good faith on the part of the officers and directors in "caus[ing] Heck's to file, and to seek confirmation of, a plan of reorganization (the "Plan") which would financially devastate Heck's shareholders, while providing a windfall to senior management ..." *See* Bankruptcy Docket No. 2859. A plain reading of the Putnam County complaint reveals that the actions complained of on the part of the officers and directors did not concern pre-petition conduct or services, but rather conduct and services rendered to the debtor-in-possession post-petition. *See* Verified Complaint, attached as exhibit to Bankruptcy Docket No. 2859, at ¶ 14 ("The automatic stay pursuant to Section 362 of the Bankruptcy Code, 11 U.S.C. § 362, is inapplicable to this Complaint, *since the acts and transactions which form the basis of this Complaint occurred after the Filing Date* ") (emphasis supplied).

Inasmuch as the claim against the officers and directors of Heck's related solely to post-petition conduct and services, the bankruptcy judge properly concluded that the officers and directors were entitled to indemnification under Heck's Articles of Incorporation and could be afforded administrative cost priority under § 503(b)(1)(A).

### 3. Due Process re Sanctions

BI & L further argues that the bankruptcy court did not provide it with notice that sanctions under Rule 9011 were being considered in connection with its final fee application, nor conduct a hearing on the propriety of such sanctions prior to entry of the final fee order. The imposition of sanctions, BI & L thus argues, violated its right to due process of law and was further violative of the bankruptcy court's own procedural order entered on August 17, 1989.

#### a.

■ With regard to the $91,582.25 sanction based on indemnification of Heck's officers and directors, it is noted that the bankruptcy court stated in a footnote to its final fee order that "[a]t pages 21 and 22 of the transcript of a December 20, 1988 hearing on various objections to BIL fees, the Court informed BIL that consideration was being given to this assessment." See Final Fee Order, 112 B.R. at 803, n. 76. During the course of that hearing, BI & L's intent to voluntarily reduce a portion of its fees by 20% was addressed, at which time the bankruptcy judge stated as follows:

Not only do I feel it is appropriate for the Equity Committee to reduce its fees as you have voluntarily chosen to do, but I am considering assessing the committee itself for the additional expenses that have been incurred by the Debtor in bringing a cause of action that we have not been asked to rule on the merits.... Frankly, I am not sure that a voluntary reduction of fees, as you have suggested, is adequate, in light of the fact that

counsel for the Debtor reports to me he is expecting the Debtor to be requested to reimburse the officers for the expenses of retaining counsel to defend a suit that I, frankly, do not know on what basis you brought.

I would submit to you that it appears entirely possible to me that Heck's should be required to reimburse those expenses only after we have offset them from fees you have asked for in the case.

See Bankruptcy Docket No. 2843.

After the bankruptcy judge's statement on the record on December 20, 1988, the court entered its order of August 17, 1989, as earlier noted, stating as follows:

The Court is currently in the process of setting final rates of compensation for all professionals who have performed services in these cases and intends to provide notice of such rates and opportunity for response prior to any final order on compensation of professionals.... [I]t being the Court's intention to provide notice and opportunity for comment or hearing as outlined above....

This court has held, see infra pages 747–48, that, inasmuch as BI & L failed to request a hearing, the notice just quoted, coupled with the opportunity for response prior to any final order on compensation, was sufficient to meet the notice and hearing requirements of section 330(a). However, with respect to the imposition of sanctions, the bankruptcy court failed to provide BI & L an opportunity for either response or a hearing. The failure to apprise BI & L of sanctions against it until the fee order was entered violated the spirit, if not the express terms, of the court's order of August 17, 1989.[26]

#### b.

■ It is well-recognized that parties facing the imposition of sanctions under Bankruptcy Rule 9011, under 28 U.S.C. § 1927, and pursuant to the court's inherent power are protected by the due process clause of the Fifth Amendment. See, e.g.,

---

**26.** There is no contention by any party to this appeal that any suggestion was thereafter made by the bankruptcy court on the record or otherwise regarding the imposition of sanctions upon

BI & L. Similarly, there is no indication that any prior notice was given respecting the reduction of lead counsel Miller's fees of $57,596.00 to zero.

*Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766–767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980); *Braley v. Campbell,* 832 F.2d 1504, 1514 (10th Cir.1987); *In re Endrex Investments, Inc.,* 111 B.R. 939, 943 (D.Colo.1990). In the final fee order in this case, the bankruptcy judge referenced only Bankruptcy Rule 9011 in sanctioning BI & L for what he concluded was improper conduct and did not purport to rely upon 28 U.S.C. § 1927 or the court's inherent authority to impose sanctions, both of which were addressed in *Roadway Express.* The court's authority to impose sanctions under *Roadway Express* has been raised in this appeal by the United States Trustee. In *Roadway Express,* the Supreme Court specifically noted that sanctions "certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." 447 U.S. at 767, 100 S.Ct. at 2464.

In *In re Endrex Investments, Inc.,* the Colorado district court held that a bankruptcy court's imposition of sanctions, *sua sponte* and without notice and opportunity to be heard, upon a debtor and its attorneys under Rule 9011 and the court's inherent power violated their right to due process. 111 B.R. 939. In reaching this decision, the *Endrex* court observed that it was undisputed that neither the creditors of the estate nor the United States Trustee had moved the court for sanctions, and that the imposition of sanctions was *sua sponte.* The court further noted that, although the parties had received notice that the bankruptcy court was prepared to consider the debtor's bad faith filing and maintenance of its Chapter 11 case at the hearing on a motion to dismiss, "the record shows that the court did not mention the issue of sanctions until the *close* of that hearing." 111 B.R. at 944 (emphasis in the original). The court concluded:

> Consequently, the appellants were deprived of any meaningful opportunity to prepare argument against the imposition of sanctions, much less present any evidence to support their argument. The problem was not corrected in the subsequent hearing on the motion for reconsideration, as the court again limited coun-

sel's introduction of evidence to support the appellant's reasonableness in attempting reorganization.

111 B.R. at 944. *In accord, see Jensen v. Federal Land Bank,* 882 F.2d 340 (8th Cir.1989) (Rule 9011); *Tom Gowney Equipment v. Shelley Irrigation Dev.,* 834 F.2d 833, 836 (9th Cir.1987) (Rule 11).

Here, as in *Endrex,* it appears that the bankruptcy court's imposition of sanctions was *sua sponte* and not based upon motion of any party to the bankruptcy case. Although the Bank Committee contends that BI & L was put on notice that their conduct was in issue due to the Bank Committee's fee objections, there is no suggestion made that the Bank Committee or any other party to the bankruptcy proceeding moved the court for sanctions against BI & L.

■ Further, it is clear from a review of cases such as *Endrex* and *Jensen* that notice pertaining to imposition of sanctions must be sufficiently specific as to provide the party a meaningful opportunity to prepare and present argument and evidence to the contrary. *See Jensen,* 882 F.2d at 341; *Endrex,* 111 B.R. at 944. In the bankruptcy judge's statement in the December, 1988, hearing, no mention was made of the term "sanctions" and no reference was made to Bankruptcy Rule 9011 or any other authority under which he intended to act. The statement was ambiguous at best and is not found to have constituted the fair notice required to satisfy due process. Further, it is conceded that no sanctions hearing was held.

### 4. *The Propriety of Sanctions*

Notwithstanding the lack of due process in the course of imposing sanctions, BI & L and the Equity Committee have informed the court of their withdrawal of their argument in this respect, while expressly reserving their contention that the bankruptcy court erred as a matter of law in imposing sanctions.

Having previously concluded that the Equity Committee improperly struck off on its own by filing a fruitless action in state court against Heck's officers and directors,

and failed, prior to doing so, to obtain leave of the bankruptcy court, *supra* pp. 763–64, it appears that the imposition of sanctions in this case may have been entirely appropriate. Because the bankruptcy court failed, however, to reference authority other than Rule 9011 in imposing sanctions against BI & L, remand is found to be necessary in order for the bankruptcy judge to analyze and make specific factual findings relative to the standards applicable to the imposition of sanctions under either or both the court's inherent authority and 28 U.S.C. § 1927.

Although the standards relative to the imposition of sanctions under Rule 11 and § 1927 have been recognized as being duplicative to some extent, courts have recognized that the two sources of authority require the application of different standards of proof. *Jones v. Pittsburgh National*, 899 F.2d 1350, 1358 (3rd Cir.1990). In *Jones*, the Third Circuit observed that, unlike Rule 11, sanctions imposed under § 1927 "only covers the excess costs generated by an attorney that resulted from a multiplication of proceedings, 'unreasonably and vexatiously,'" and that § 1927 "requires a finding of counsel's bad faith." *Id.* In *Jones*, as in the present case, remand was found to be necessary inasmuch as the district court did not differentiate between Rule 11 and § 1927 in imposing sanctions. *Id.*

Other courts, like *Jones*, have recognized that the imposition of sanctions under either the court's inherent authority or § 1927 requires a finding of bad faith on the part of counsel. *See, e.g., In re Peoro*, 793 F.2d 1048, 1051 (9th Cir.1986) ("It is clear that the crucial element for a fee award under 28 U.S.C. § 1927 is 'bad faith'"); *Dreiling v. Peugeot Motors of America*, 850 F.2d 1373, 1382 (10th Cir. 1988) (fees may be awarded under *Roadway Express* where losing party "has acted in bad faith, vexatiously, wantonly or for oppressive reasons." "[N]egligence, frivolity or improvidence" will not suffice); *Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1191 (3rd Cir.1989) (court should exercise authority under § 1927 "only in instances of a serious and studied

disregard for the orderly process of justice ... [and] must find willful bad faith on the part of the offending attorney"). *See also Blair v. Shenandoah Women's Center, Inc.*, 757 F.2d 1435, 1437–38 n. 5 (4th Cir. 1985) (court may award expenses and fees under *Roadway Express* line of authority to a litigant "whose opponent acts in bad faith in instituting or conducting litigation").

Upon remand, the bankruptcy court is reminded that the factual analysis and findings to be made relative to the propriety of the sanctions under the court's inherent authority or under § 1927 must focus upon the conduct of BI & L relating to the filing of the officers and directors action in state court, without leave of the bankruptcy court, which this court has previously concluded was improper. Conduct on the part of BI & L relative to matters which this court has previously concluded was not unreasonable, unnecessary or inconsistent with the legitimate pursuit and advancement of BI & L's client's interests in the case is not to be revisited except that such conduct may be considered insofar as it constitutes a part of the totality of the circumstances indicating whether the fiduciary action was filed and maintained vexatiously or in bad faith by BI & L.

**B. The Withholding of Robert Miller Compensation of $57,596**

 The bankruptcy court reduced to zero the rate of compensation allowed Robert Miller, lead counsel for the Equity Committee, for the "great majority" of hours billed by Miller for the period from June 1, 1988, through September 30, 1989. In doing so, the total sum of $57,596 in compensation sought by BI & L was denied for Miller's efforts which the bankruptcy court concluded were "inconsistent with the requirements of Bankruptcy Rule 9011," and which "threatened the very possibility of reorganization." *See* Final Fee Order, 112 B.R. at 808. The court reasoned that "beginning in June, 1988, lead counsel of Equity Committee launched a barrage of meritless demands and threats, characterized by the Bank Committee as outrageous, that

were intended to coerce other creditors in the case and put in jeopardy the ability of the DIP to provide recovery for anyone. These actions were improper in the representation of equity interests and damaged the DIP by creating substantial administrative expense, delay and confusion." Final Fee Order, 112 B.R. at 808.

The bankruptcy court also observed that Miller had failed to comply with the terms of Administrative Order III, which required supervising attorneys to "strictly adhere to 11 U.S.C. § 330 in determining the allocation of work to be performed by their firms," and to "exercise control over time spent by associates and paralegals on research, revision, and editing ..." *See* Final Fee Order, 112 B.R. at 806. Unfortunately, the bankruptcy court failed either to specify what particular hours of service it was denying or quantify the extent of the denial for a given ground among the several general reasons which it assigned.

The parties, however, have stipulated that of the $57,596.00 sought, $7,596.00 relates to the officers and directors action and the balance of $50,000.00 relates to other services performed by Miller in the course of his representation of the Equity Committee. Unlike the $7,596.00, which the bankruptcy court properly denied, the $50,000.00 appears to represent services performed for which BI & L is entitled to be paid. The bankruptcy court's displeasure with Miller's having filed the motion in state court for a shareholder meeting and the motion in bankruptcy court for appointment of an operating trustee is not an adequate reason for the denial of compensation in connection therewith. The suggestion that the 26-day flurry of activity threatened the very possibility of reorganization is not based on a realistic view

of that which was taking place. Save for the unauthorized action against the officers and directors, all of that activity was permissible. Indeed, it served very quickly to bring the parties together. There is simply no evidence to support the finding that the very possibility of reorganization was thereby jeopardized. Inasmuch as no sufficient ground has been delineated and quantified as the basis for denying any particular portion of the Miller services other than that pertaining to the officers and directors action, the $50,000.00 must be allowed to BI & L.[27]

## V. *Conclusion*

For the reasons fully set forth in section III of this order pertaining to the bankruptcy court's denial of fees to BI & L in the amount of $214,362.45, it is accordingly **ORDERED** that the bankruptcy court's denial of fees to Berlack, Israels & Liberman for services rendered as counsel for the Equity Security Holders' Committee be, and the same hereby is, affirmed to the extent of $114,110.03, and reversed to the extent of $100,252.42 to the end that fees sought by BI & L in conjunction therewith be, and the same hereby are, allowed in such amount of $100,252.42.

For the reasons fully set forth in section IV of this order pertaining to the bankruptcy court's imposition of sanctions upon BI & L in the amount of $91,582.25, it is accordingly ORDERED that the bankruptcy court's imposition of sanctions against Berlack, Israels & Liberman as counsel for the Equity Security Holders' Committee be, and the same hereby is, reversed to the extent of $9,100.00 to the end that fees denied to BI & L in conjunction therewith be, and the same hereby are, allowed in such amount of $9,100.00; and it is further **ORDERED** that this matter be remanded

---

**27.** The parties to this appeal have further stipulated and agreed as follows:

 Berlack, Israels & Liberman is entitled to receive the "final compensation" of $70,989.79 in fees and $29,707.32 in expenses which were approved by the Bankruptcy Court in its February 21, 1990 "Order Awarding Final Compensation to Counsel for Equity Security Holders' Committee, Berlack, Israels & Liberman, Pursuant to Memorandum Opinion Entered February 21, 1989 [sic]," but which has

not been paid to Berlack, Israels & Liberman, pursuant to the provision in that Order that no moneys be paid to Berlack, Israels & Liberman if an appeal was taken therefrom ... [together with] interest on the aforementioned withheld fees of $70,989.79 and the aforementioned withheld expenses of $29,707.32, from February 21, 1990, at the interest rate actually earned on the escrow account established pursuant to Article III of the Plan.

to the bankruptcy court with respect to the issue of sanctions in the amount of $82,482.25 for further proceedings in accordance with this opinion, including opportunity for the parties to introduce evidence and be heard in connection therewith.

For the reasons fully set forth in section IV of this order pertaining to the bankruptcy court's denial of fees pursuant to Bankruptcy Rule 9011 to BI & L's lead counsel, Robert Miller, in the amount of $57,596.00, it is accordingly **ORDERED** that the bankruptcy court's denial of such fees be, and the same hereby is affirmed to the extent of $7,596.00, and reversed to the extent of $50,000.00 to the end that the fees denied to BI & L in conjunction therewith for work performed by Miller be, and the same hereby are, allowed in the amount of $50,000.00.

### JUDGMENT ORDER

For the reasons set forth in the memorandum order this day entered in the above-styled consolidated civil actions, it is **ORDERED, ADJUDGED** and **DECREED** that the bankruptcy court's denial of fees to Berlack, Israels & Liberman for services rendered as counsel for the Equity Security Holders' Committee be, and the same hereby is, affirmed to the extent of $121,706.03; reversed and allowed to Berlack, Israels & Liberman to the extent of $159,352.42; and remanded to the bankruptcy court with respect to the issue of sanctions in the amount of $82,482.25 for further proceedings in accordance with the memorandum order this day entered, including opportunity for the parties to introduce evidence and be heard in connection therewith.

It is further **ORDERED**, in accordance with the stipulation and agreement of the parties on appeal, that Berlack, Israels & Liberman receive fees of $70,989.79 and expenses of $29,707.32 approved by the bankruptcy court in its order of February 21, 1990, together with interest thereon from February 21, 1990, at the interest rate actually earned on the escrow account established pursuant to Article III of the debtor's confirmed plan.

All matters in these consolidated appeals having been resolved, it is further **ORDERED** that these actions be dismissed and stricken from the docket of the court.